457 A.2d 911

**COMMONWEALTH of Pennsylvania**

**v.**

**Herbert L. BRADLEY, John H. Burroughs, Thomas J. Buzzar, and Louis C. Stith, Appellants.**

Superior Court of Pennsylvania.

Argued Jan. 28, 1981.

Filed Feb. 25, 1983.

Petition for Allowance of Appeal Granted Sept. 2, 1983.

A. Charles Peruto, Jr., Philadelphia, for appellants.

Joseph Hylan, Assistant District Attorney, for Norristown, for Commonwealth, appellee.

Before CAVANAUGH, JOHNSON and LIPEZ, JJ.

CAVANAUGH, Judge:

The issue raised in this appeal is whether the circumstances surrounding the trial judge's *sua sponte* declaration of a mistrial reached the level of manifest necessity. Appellants argue that manifest necessity was not shown and that retrial of the appellants is therefore barred by the doctrine of double jeopardy. We agree, and therefore order that the appellants be discharged.

The appellants, prison guards at the State Correctional Institution at Graterford, were charged with various offenses arising out of an incident during which an inmate was severely beaten. The case was called to trial before the Honorable Horace A. Davenport and a jury. The Commonwealth called Earl Worthy, an inmate at the prison, as a witness. A luncheon recess interrupted Mr. Worthy's direct testimony and Mr. Worthy was returned to the holding cell, or "bull pen", on the ground floor of the Montgomery County Courthouse. During the luncheon recess, defense counsel, Mr. Peruto, had Mr. Worthy, with whom he was previously acquainted, taken to a private room where the two spoke for a few minutes. Before Court resumed for the afternoon, Mr. Worthy advised the district attorney of

the interview and the district attorney in turn reported the private conversation to the Court. Judge Davenport conferred with counsel in chambers, at which time Mr. Peruto confirmed that he had spoken with Mr. Worthy. The Court then questioned Mr. Worthy about the conversation on the record, with the jury absent. The testimony, in relevant part, was as follows:

By The Court:

Q. Mr. Worthy, it has been reported to me by Mr. Schireson, the assistant district attorney, that during the lunch hour you were contacted in the bull pen by Mr. Peruto, that there was a conversation which took place down there. The essence of the conversation I will not go into as it was reported to me, but I want to ask you specifically for you to relate to the Court for the record exactly what took place.

A. Mr. Peruto requested to me, and I complied to his request. We had a previous acquaintance from a prior case, whereas he was indirectly involved as my attorney. What I mean by indirectly was he was attorney for someone, a co-defendant of mine. And we know each other from that acquaintance. And there was not anything discriminatory toward this case mentioned at that time.

Q. I want you to relate to me exactly what the conversation was which took place down in the bull pen.

A. The words, you mean?

Q. As close as you can recall.

A. Mr. Peruto asked did I intend to hurt him.

Q. Mr. Peruto said what?

A. He asked me did I intend to hurt him on this trial here. And I told him I would do what was necessary. And I think he asked me why. And I said that it was a matter of principle, according to my code of ethics, that I partake of this trial truthfully, and that I would.

However, I expressed my regrets that he was attorney for the opposition in this case.

And we spoke somewhat about the other case, you know, in which we was victorious. And it became plain, neither one of us was going to give any information regarding this case at hand. And Mr. Peruto just told me it wasn't nothing personal.

Q. Mr. Peruto told you what?

A. There wasn't nothing personal, but he was going to tear me down on cross-examination. That's what he is supposed to do if he can. And that was the extent of the conversation.

Q. Was there any reference to any future activities on his part or on your part?

A. What do you mean?

Q. Was there any threat to do something in the future, any promise to do something in the future? Was this conversation and discussion in a conversational tone? Were there others present who heard it?

A. No, there was no one present but him and I. It was not a heated argument. We just sat and talked.

Q. I asked, was there any promise or threats.

A. There was no promises. There was no threats.

Q. Is what you have related the full and complete conversation which you had down there?

A. I recall Mr. Peruto saying that he paid his debts. And I suppose that would be determined—that could be determined in many respects.

Q. How did the phrase, he would pay his debts, come up?

A. To my recollection, I cannot adequately describe at what stage that came up.

Q. What did the phrase, "he pays his debts" mean to you?

A. Well, to me it means that if I was to become lenient in my testimony or somewhat helpful toward him that I would be reimbursed for my services. But that is not to say that's what he meant. He could have meant something totally different.

■ Following Mr. Worthy's testimony, the Court asked to see counsel in chambers, prompting the following exchange:

Mr. Peruto: Before we go in chambers, could I ask a question?

The Court: Mr. Peruto, I don't think it would be appropriate under the circumstances in this proceeding.

The Witness: Excuse me, Your Honor. Did he just ask you could he ask me a question?

The Court: Yes.

The Witness: I may have made a mistake in something I said. I would appreciate if you would let him ask me the question, because I don't want to incriminate Mr. Peruto. He should be given a chance to defend himself, if I said something wrong. I don't have any objection to him questioning me.

The Court: Mr. Worthy, that may be correct, but the Court says there will be no questions asked.

The Court did confer with counsel in chambers and, after returning to the courtroom, stated that it was declaring a mistrial and that the case would be rescheduled for trial at a later date. The appellants' subsequent Application to Bar Reprosecution was denied by the trial court and this appeal followed.[1]

1. There is a jurisdictional issue present in this appeal which we feel compelled to address, although it was not raised by either party. The record and the briefs suggest that this appeal was taken from the order entered April 2, 1980, declaring a mistrial and ordering that the case be rescheduled for trial. Such an order is not a final, appealable order. There was, however, an Application to Bar Reprosecution filed on April 11, 1980, which was denied on April 14, 1980. The notice of appeal was filed April 29, 1980.

The normal procedure in a case of this type is for the defendant to file a pre-trial motion to dismiss the indictment on double jeopardy grounds. An order denying such a motion is an appealable order. *Commonwealth v. Santiago*, 492 Pa. 297, 424 A.2d 870 (1981); *Commonwealth v. Mitchell*, 488 Pa. 75, 410 A.2d 1232 (1980); *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977). In the interest of judicial economy, we will consider the Application to Bar Reprosecution to be the equivalent of a motion to dismiss the indictment, and we will treat this appeal as having been taken from the denial of the Application to Bar Reprosecution.

 Pennsylvania Rule of Criminal Procedure 1118(b) provides that:

> When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity.

Where the defendant does not consent to the declaration of a mistrial, retrial is barred by the double jeopardy clauses of The United States and Pennsylvania Constitutions unless manifest necessity is shown. *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977). In determining whether the circumstances surrounding the declaration of a mistrial in a given case bar reprosecution on the same charges, "we apply the standards established by both Pennsylvania and federal decisions." *Commonwealth v. Mitchell*, 488 Pa. 75, 78, 410 A.2d 1232, 1233 (1980).

The "manifest necessity" standard dates back to 1824, when the United States Supreme Court stated that a trial judge may declare a mistrial only when, "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *U.S. v. Perez*, 22 U.S. (9 Wheat) 579, 580, 6 L.Ed. 165 (1824).

In a more recent case, the Supreme Court stated that "the discretion to discharge the jury before it has reached a verdict is to be exercised only in very extraordinary and striking circumstances, .... For the prohibition of the Double Jeopardy Clause is 'not against being twice punished, but against being twice put in jeopardy.'" *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) (citations omitted).

Trial courts should be especially reluctant to declare a mistrial in cases where the defendant does not consent to such an action. As the Supreme Court stated in *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971):

[W]here the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his "valued right to have his trial completed by a particular tribunal".... [T]he defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial.

400 U.S. at 484–85, 91 S.Ct. at 556–57. Thus if a defendant does not consent to the mistrial,

[T]he Perez doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.... [I]n the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society though the verdict of a tribunal he might believe to be favorably disposed to his fate.

*United States v. Jorn, supra,* 400 U.S. at 485–86, 91 S.Ct. at 557. *See also Commonwealth ex rel. Walton v. Aytch,* 466 Pa. 172, 352 A.2d 4, *cert. denied,* 429 U.S. 867, 97 S.Ct. 178, 50 L.Ed.2d 147 (1976); *Commonwealth v. Shaffer,* 447 Pa. 91, 288 A.2d 727, *cert. denied,* 409 U.S. 867, 93 S.Ct. 164, 34 L.Ed.2d 116 (1972); *Commonwealth v. Ferguson,* 446 Pa. 24, 285 A.2d 189 (1971); *Commonwealth v. Stroup,* 244 Pa.Super. 173, 366 A.2d 1248 (1976).

The Pennsylvania Supreme Court observed in *Commonwealth v. Bolden,* 472 Pa. 602, 641, 373 A.2d 90, 108–09 (1977) that:

The double jeopardy clause is not designed solely to preclude bad faith harassment of an individual by government prosecutors. It also serves ... "to protect the defendant from continued exposure to embarrassment, anxiety, expense, and restrictions on his liberty." (Citation omitted).

338

A defendant's right to have his trial completed by a particular tribunal merits constitutional protection because:

> Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed.

*Arizona v. Washington*, 434 U.S. 497, 503–04, 98 S.Ct. 824, 829, 54 L.Ed.2d 717 (1978) (footnotes omitted).

■ Before a trial court can properly declare a mistrial *sua sponte*, it should consider whether there are any less drastic alternatives which would allow the trial to continue. Failure to consider alternatives before declaring a mistrial is grounds for barring retrial. *United States v. Jorn, supra, Commonwealth ex rel. Walton v. Aytch, supra; Commonwealth v. Ferguson, supra; Commonwealth v. Dull*, 257 Pa.Super. 192, 390 A.2d 777 (1978).

■ It is also well established that any doubt as to the existence of manifest necessity must be resolved in favor of the defendant. *Downum v. United States, supra; Commonwealth v. Bycer*, 485 Pa. 224, 401 A.2d 740 (1979); *Commonwealth v. Bartolomucci*, 468 Pa. 338, 362 A.2d 234 (1976); *Commonwealth v. Ferguson, supra; Commonwealth v. Carson*, 259 Pa.Super. 183, 393 A.2d 778 (1978).

With these principles in mind, we turn to an examination of the circumstances in the instant case. The *sua sponte* declaration of a mistrial by the lower court was prompted by a "private conversation" between appellants' counsel and a Commonwealth witness. The conversation took place during a lunch recess which interrupted the witness' direct testimony. There is nothing *per se* improper about counsel having such a private discussion with a witness. There is nothing in the record to suggest that the witness had been instructed by the court not to talk to defense counsel during

the break. The witness reported the conversation to the district attorney, who in turn reported it to the trial judge. Following an in-chambers conference with counsel, the trial judge, with the jury absent, questioned the witness about the conversation. The judge then declared a mistrial *sua sponte* because of his belief that defense counsel may have been guilty of tampering with the witness.

The trial judge states in his opinion that he questioned the witness "only because of the nature of the report of the interview." Slip opinion at 2. The record does not indicate what the nature of the report was. The testimony of the witness on the record reveals only the rather ambiguous statement attributed to counsel that he "pays his debts." Even the witness admitted that the statement "could be determined in many respects." The court refused to permit defense counsel to question the witness about the accuracy of the statements attributed to him or the context in which they were made even though the witness expressed a desire to be cross-examined by defense counsel in case he (the witness) "said something wrong."

Under these circumstances, we fail to see how the trial court could conclude that there was manifest necessity to grant a mistrial. Based on these scant facts and in the face of the court's unwillingness to examine the issue in more depth, we do not believe that there was a basis for the court to conclude that counsel had been tampering with a witness. The lower court at this stage should have considered alternatives to aborting the entire trial. It is possible that the whole matter could have been cleared up if the court had allowed defense counsel to cross-examine the witness and establish the actual substance of the conversation and the context in which the allegedly incriminating statements were made.

Having leaped to the conclusion that there may have been tampering the court proceeded to declare a mistrial *sua sponte* and justified this decision on the basis that the possibility of tampering had so affected counsel's ability to effectively represent his clients that a mistrial was neces-

sary. We do not feel that under the circumstances such a conclusion was necessary, especially in view of the fact that neither the defendants nor their counsel were given an opportunity to respond to the court's expression of concern or to exercise an intelligent decision to proceed even in the face of the court's protective solicitude. In sum, we believe that the trial court, based on a communication from counsel for a litigant proceeded into a probe of a conversation between a witness and counsel, and then concluded on the basis of scant and ambiguous evidence that there may have been wrongdoing. The effect of this hasty conclusion was aggravated by the *sua sponte* declaration of a mistrial in the face of clear alternatives.

■ In its opinion, the trial court likens the circumstances in this case to those of *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977), in which the Pennsylvania Supreme Court permitted retrial following a mistrial which was granted when it was revealed that statements made by a surprise Commonwealth witness implicated defense counsel in a conspiracy to murder the chief prosecution witness. The lower court claims that here, as in *Bolden,* a conflict of interest between appellants and their counsel arose regardless of the truth of the allegations because counsel could not effectively cross-examine the witness for fear of exposing the allegations. The situation in this case, however, is quite different from that in *Bolden.* In *Bolden* the witness was expected to testify about the alleged plot to murder a witness and it was foreseeable that defense counsel's alleged participation in the conspiracy would arise. In the instant case, the conversation which defense counsel had with the witness during the lunch recess was totally unrelated to the events about which the witness was testifying. Logic does not support the lower court's conclusion that defense counsel would be unable to "effectively cross-examine" the witness for fear of exposing the allegations of misconduct on his part. On the contrary, it is hard to

imagine how the subject of the private conversation could arise on direct or cross-examination.[2]

The lower court emphasized its concern for defense counsel's ability to effectively represent his client where it stated in its opinion that "[w]hen defense counsel is no longer qualified to represent his clients' best interests, protection of the defendants' rights becomes the court's responsibility." Slip opinion at 2. The court ignored, however, the appellants' "right to have [their] trial completed by a particular tribunal." *United States v. Jorn, supra,* 400 U.S. at 484, 91 S.Ct. at 557. It was insensitive to the fact that defendants have "a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial." *Id.* at 485, 91 S.Ct. at 557. Moreover, as the Supreme Court has stated, "[r]eprosecution after a mistrial has unnecessarily been declared by the trial court obviously subjects the defendant to the same personal strain and insecurity regardless of the motivation underlying the trial judge's action." *Id.* at 483, 91 S.Ct. at 556.

■ Because the trial court did not consider reasonable alternatives to a *sua sponte* declaration of mistrial, we feel that retrial of these appellants would violate their double jeopardy rights. The United States Supreme Court and Pennsylvania appellate courts have reached the same conclusion in many cases and have barred retrial because the trial court did not consider possible alternatives or because it acted too hastily in declaring a mistrial before ascertaining that it was necessary. *See, e.g., United States v. Jorn, supra; Commonwealth v. Bartolomucci, supra; Commonwealth ex rel. Walton v. Aytch, supra; Commonwealth v. Ferguson, supra; Commonwealth v. Dull, supra; Commonwealth v. Carson, supra; Commonwealth v. Stroup, supra. See also, Arizona v. Washington,* 434

**2.** Reliance on Bolden would be misplaced at any rate because in Bolden the defendant requested a mistrial. It was not declared by the court *sua sponte.* A request or consent by the defendant to a mistrial normally removes any bar to retrial. *Commonwealth v. Bartolmucci,* supra, 468 Pa. 347, 362 A.2d at 238.

U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978) (retrial following the *sua sponte* declaration of a mistrial was permitted only because the lower court *did* make an effort to come up with alternatives before declaring a mistrial).

Having reviewed the record in this case in light of the manifest necessity standard, and keeping in mind the rule that "any doubt about the propriety of the trial court declaring a mistrial *sua sponte* must be resolved in favor of the defendant," *Commonwealth v. Bycer, supra,* 485 Pa. at 227, 401 A.2d at 742, we conclude that retrial in this case would constitute double jeopardy.

Order denying Application to Bar Reprosecution reversed. Appellants shall be discharged.

JOHNSON, J., files dissenting opinion.

JOHNSON, Judge, dissenting:

I am constrained to dissent. I do not disagree with Judge Cavanaugh's accurate analysis of the law of double jeopardy. I understand that case law in this jurisdiction has not provided us with precedent for finding manifest necessity in such circumstances as those of this case. However, it is our duty as an appellate court to apply the law, in this case the law of double jeopardy, not only to protect a defendant's right to have his trial completed by a particular tribunal and to protect defendants from the harassment of multiple prosecutions, *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543, (1971), but also to guarantee the public's interest in fair trials designed to end in just judgments. *See Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), *quoted in Jorn, supra,* 400 U.S. at 480, 91 S.Ct. at 554–55, 27 L.Ed.2d at 554.

My disagreement with the majority view here involves its analysis of the reaction of the trial court to the situation. I disagree that the court "leaped to the conclusion" that there may have been tampering. My view is that the appellate court should give more weight to the trial court's exercise

of discretion when the trial court was faced with an unexpected situation which involved perhaps illegal or unethical, but at least questionable, conduct by defense counsel. The trial court's response was admittedly swift, but not arbitrary or capricious. The majority opinion chastises the trial court for not considering reasonable alternatives to a *sua sponte* declaration of mistrial, yet does not suggest what these alternatives might be, other than to have permitted defense counsel to cross-examine the witness. The reason the trial court gave for choosing not to permit this was that it decided that such a line of inquiry would compromise defense counsel's advocacy of his client's cause, turning it into a situation of self-exoneration for defense counsel.[1] In other words, the trial court *did* consider an alternative, and rejected it.

A further reason which the trial court gave for deciding to end the trial at this stage was the likelihood of a subsequent appeal requesting a new trial on the grounds that defense counsel, trying a case with the shadow of alleged impropriety looming over him, was unable to try the case effectively, and thus deprived the defendants of the effective assistance of counsel.[2]

I see this situation as one where the defendant's valued right to have his trial completed by a particular tribunal is subordinate to the public's interest in fair trials and just judgments. *See United States v. Jorn*, 400 U.S. at 480, 91 S.Ct. at 554–55, 27 L.Ed.2d at 554.

I would affirm the denial of the application to bar reprosecution, on the grounds that in the untoward circumstances of the case, involving possibly highly improper behavior of defense counsel, the trial court was faced with manifest necessity to declare a mistrial *sua sponte*, and that the double jeopardy bar to retrial is inapplicable.

1. *Commonwealth v. Bradley et al.*, No. 4982–79, slip op. August 15, 1980 at 8, and N.T. April 2, 1980 at 7 (C.P. Montgomery County, 1980).

2. *Id.* Slip op. at 9, N.T. at 7.