J-S26002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
  :
v.   :
  :
  :
  :
HENRY LOUIS TANGUAY   :
  :
Appellant   :   No. 1029 MDA 2021

Appeal from the Judgment of Sentence Entered July 6, 2021,
in the Court of Common Pleas of Cumberland County,
Criminal Division at No(s): CP-21-CR-0002489-2019.

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:       **FILED AUGUST 22, 2022**

Henry Louis Tanguay appeals from the judgment of sentence of 2 ½ to 7 years of incarceration entered following his conviction of aggravated indecent assault, indecent assault, and two counts of corruption of minors.[1] Tanguay challenges the trial court's decisions to deny his motion for mistrial and overrule his objections to the prosecutor's closing arguments. We affirm.

On August 27, 2019, police charged Tanguay based on a report that he had touched Z.G.'s breasts and vagina on December 28, 2018, when he was 22 and she was 14. The case proceeded to jury trial in March 2021. As detailed *infra*, Tanguay moved for a mistrial because the Assistant District Attorney (ADA) met with Z.G. after an overnight recess in the middle of Z.G.'s

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3125(a)(8), 3126(a)(8), and 6301(a)(1)(ii).

cross-examination. The trial court denied the motion. In closing arguments, Tanguay objected to several statements by the ADA, and the court overruled the objections. The jury found Tanguay guilty of the charged offenses. On July 6, 2021, the trial court sentenced Tanguay. Tanguay timely appealed. He complied with Pennsylvania Rule of Appellate Procedure 1925(b).

Tanguay presents two issues for our review:

Did the trial court err when it reversed an initial decision to grant a mistrial when it was discovered that the prosecutor had discussions with its complaining witness regarding specifics of [Tanguay's] trial strategy during an overnight break in cross-examination?

Did the [trial] court err in not sustaining [Tanguay's] objection to burden-shifting language by the Commonwealth in closing argument?

Tanguay's Brief at 6.[2]

## Mistrial

Tanguay first claims that the trial court erred in denying his motion for a mistrial. On the first day of trial, the Commonwealth presented Z.G. as its third witness. During cross-examination, the trial court recessed the trial until the next day. When trial resumed with the continuation of cross-examination, Z.G. revealed that the ADA had spoken with her:

Q. . . . In between yesterday and today, did you have any discussions about the case with anyone?

A. Only with my attorney. . . .

---

[2] Tanguay withdrew the issue in his Rule 1925(b) statement about the legality of his sentence.

- 2 -

Q. You met with your attorney?

A. I talked to her about it this morning.

Q. You talked to [the ADA] about the case this morning?

A. Yes.

Q. What did you talk to [the ADA] about the case this morning?

A. We just overviewed it and talked about how I did.

[Defense counsel requested a sidebar; at sidebar:]

[Defense counsel]: Judge I don't know what the extent of the conversation was between [the ADA] and the witness, who was still constructively at cross. I do believe that any sort of discussion about this case and her performance is improper.

THE COURT: I agree.

[The ADA]: I spoke to [the District Attorney], and he advised that I could give her some encouragement.

[The court recessed the jury and questioned Z.G.:]

Q. Now, who did you meet with? Did you meet with [the ADA]?

A. I met with Detective Coffey, [the ADA], and Shelly [Farmery], my victim advocate.

Q. Did you meet with them all together?

A. Um-hum.

Q. When was that?

A. That was this morning at 9:00.

Q. How long did you meet?

A. About 20 minutes.

Q. Okay. What did you discuss?

A. We just overviewed what we did yesterday and talked about the texts, just that I was reading them, nothing specific.

Q. I'm not sure.  You talked about the texts that you reviewed here yesterday?[3]

A. Yes.

Q. What did you talk about?

A. I just asked why [E.S., a friend,] was relevant in the case.

Q. Okay.  Did you talk at all about anything else?

A. No.

Q. Did you talk at all about what your testimony might be today?

A. No.

[Defense counsel asked additional questions:]

Q. [Z.G.], did you ask about why I was having you read those messages?

A. Not specifically, no.  I understood why.

Q. Did you have any specific discussions about any of my trial strategy with the victim/witness or [the ADA]?

A. What do you mean? . . .

Q. About why I was doing certain things or why evidence is being presented.

A. I was a little confused about why we had to read all of them, and I also asked her why—about your opening,[4] but that was it.

THE COURT: And what did she say?

[Z.G.]: I just thought his introduction was a bit bizarre, and I mentioned that to [the ADA].

---

[3] Defense counsel presented numerous text message exchanges by having Z.G. read the messages that she composed and reading the other messages himself.  N.T., 3/23/21, at 159–178; N.T., 3/24/21, at 12–29.

[4] Z.G. was referring to the start of defense counsel's cross-examination of her: "[Z.G.], I'm kind of excited to finally meet you in that we've spent a lot of time researching your case, going through your—"  N.T., 3/23/21, at 142. Everyone agreed that this was bizarre.  N.T., 3/24/21, at 8.

THE COURT: What did she say?

[Z.G.]: She just said that she thought it was, as well.

THE COURT: Anything else?

[Z.G.]: No.

N.T., 3/24/21, at 4–7.

After Z.G.'s testimony regarding the ADA's conversation with her, defense counsel conferred with Tanguay and moved for a mistrial:

[Defense counsel]: Judge, after discussion with my client, I would like to request a mistrial in this case.

THE COURT: [ADA], I'm afraid I'm going to have to grant that.[5]

[The ADA]: Your Honor, may I respond to that before a decision is made?

THE COURT: You can certainly respond.

[The ADA]: Your Honor, I believe that what [Z.G.] has testified to was in the line and the vein of encouragement rather than—there was no strategic discussion or anything like that.

THE COURT: You had a 20-minute meeting with the police officer, the victim advocate and the prosecuting attorney while the witness was on the stand. You know better or should know better—

[The ADA]: I understood—

THE COURT: —than to do that. It doesn't take 20 minutes to say you did a good job.

[The ADA]: Respectfully, Your Honor, the estimate in time was not accurate. I understand what her testimony was. I had consulted with my supervising attorneys. They did advise that encouragement was appropriate.

---

[5] Tanguay characterizes this as the trial court granting the motion. We read it as a statement of intent, where the court has not yet granted the motion.

THE COURT: Encouragement is appropriate.

[The ADA]: Respectfully, Your Honor, we met—and I think Ms. Farmery could attest, too—that it was a matter of about five minutes, because I met with them after 9:15. We had to be back up here at 9:30.

[Z.G.]: Sir, I was just saying that we had been in the room for 20 minutes. I didn't say that we discussed the case for 20 minutes.

[The ADA]: I believe that [Z.G.] had been in the room for 20 minutes. Detective Coffey and I didn't get there until 9:10 or 9:15.

[Z.G.]: I'm just saying that I arrived about—

[The ADA]: There was no talk about strategy. It was encouragement that she did well yesterday after a difficult night when she had to go home midway through.

THE COURT: All right. Then I find that the meeting took place for five minutes, was limited to simple encouragement, and that no details of the case were discussed. On those grounds, I will deny the mistrial.

*Id.* at 9–11.

Once the jury returned, defense counsel continued cross-examination by asking Z.G. about the ADA's interactions with her:

Q. [Z.G.], I'm going to start with you did nothing wrong, okay? Don't feel [bad about] this. We're just going to cover a couple of things that we covered when the jury was out. And don't feel bad about any of this, okay? None of this is your fault.

THE COURT: [Defense counsel], please—

[Defense counsel]: She is visibly upset, Judge, and I just want to—

THE COURT: Do you need a break, [Z.G.]?

[Z.G.]: No. . . .

Q. [Z.G.], before you testified today, you met with [the ADA], correct?

A. Correct.

Q. What did you talk to her about?

A. I talked to her about when you greeted me, and I talked about the relevance of my messages with [E.S.]

Q. How long was that conversation about the text messages?

A. About five minutes.

*Id.* at 11–12.

Turning to Tanguay's issue, we review a trial court's denial of a motion for a mistrial for an abuse of discretion. *Commonwealth v. Gilliam*, 249 A.3d 257, 274 (Pa. Super. 2021) (citation omitted).

> In criminal trials, declaration of a mistrial serves to eliminate the negative effect wrought upon a defendant when prejudicial elements are injected into the case or otherwise discovered at trial. A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.

*Id.* at 274 (quotation marks and citations omitted). We will not readily find that a trial court abused its discretion by denying a motion for mistrial after taking "prompt curative actions." *Commonwealth v. Hoffman*, 447 A.2d 983, 985 (Pa. Super. 1982) (citing *Commonwealth v. Tribblett*, 363 A.2d 1212 (Pa. Super. 1976)).

There is scant law about an attorney consulting a witness called by the attorney during a break in that witness' testimony. *Yoskowitz v. Yazdanfar*, 900 A.2d 900, 905 (Pa. Super. 2006). Although the Pennsylvania Rules of

Evidence do not address this situation,[6] it is customary that witnesses are told not to discuss their testimony during breaks in cross-examination (unlike in direct examination).[7]  *Id.*  The reason is that a witness who consults an attorney during a recess in that witness' testimony could be coached in a way to undermine the effectiveness of trial.  *See Perry v. Leeke*, 488 U.S. 272, 281–82 (1989).

We previously considered whether a defense attorney talking to a Commonwealth witness during a break in direct examination provided "manifest necessity" for a trial court to declare a mistrial *sua sponte*. *Commonwealth v. Bradley*, 457 A.2d 911 (Pa. Super. 1983), *aff'd*, 504 Pa. 175 (1984); *see* Pa.R.Crim.P. 605.  In *Bradley*, the trial judge examined the witness, who said that the defense attorney talked about cross-examination and made an ambiguous statement about paying his debts.  *Bradley*, 457 A.2d at 913.  The judge denied the attorney's request to question the witness and declared a mistrial based on witness tampering.  *Id.* at 913–14.  We found this insufficient to show wrongdoing by the attorney; there was no manifest necessity for a mistrial "in the face of clear alternatives."  *Id.* at 916.

We reject the Commonwealth's characterization that the ADA's actions in this case were less severe than those of the attorney in *Bradley*.  In

---

[6] The Rules provide for witness sequestration at the trial court's discretion. Pa.R.E. 615.  Here, no sequestration order appears in the record.

[7] Here, the trial court did not instruct Z.G. not to discuss her testimony during the overnight recess in her cross-examination.  N.T., 3/23/21, at 179.

***Bradley***, a defense attorney talked to a witness called by opposing counsel during a break in direct examination. Here, the ADA talked to a witness whom she had called during a break in cross-examination. Both scenarios invite the possibility that an attorney coached a witness outside the presence of the jury, undermining the effectiveness of trial. ***Perry***, ***supra***.

What distinguishes this case from ***Bradley*** is the trial court's reasoned response to the revelation that the ADA had spoken with Z.G. To determine whether the ADA coached Z.G., the trial court thoroughly questioned Z.G. outside the presence of the jury and allowed counsel to do likewise. The trial court determined that the improper meeting was brief and was limited to simply encouraging Z.G. Further, defense counsel cross-examined Z.G. about the meeting, so the jury was aware of any inappropriate discussion. The trial court also provided a cautionary instruction to the jury about the ADA's improper conduct.[8] These were appropriate responses to address the ADA's improper conduct. Under these circumstances, we cannot say that the trial court abused its discretion in denying Tanguay's motion for a mistrial.[9]

_____

[8] "Now, you heard some testimony that one of the witnesses spoke to a lawyer while we were on recess. That was improper. That shouldn't have been done. You can use that fact when determining the credibility of that witness's testimony, if you choose." N.T., 3/25/21, at 76.

[9] Tanguay complains that the trial court did not let defense counsel question the other participants in the conversation, nor did it grant a mistrial after Z.G.'s further testimony. Tanguay's Brief, at 20–21. As Tanguay did not ask to examine the other participants or move for mistrial in response to Z.G.'s additional testimony, he has waived these contentions. Regardless, the trial court took ample steps to determine the extent of the ADA's improper conduct, and we find no abuse of discretion in not taking additional steps.

**Closing Argument**

Tanguay next claims that the trial court erred in overruling his objections to portions of the ADA's closing argument. In reviewing such a challenge, we will reverse only if the trial court abused its discretion. ***Commonwealth v. Reid***, 259 A.3d 395, 425 (Pa. 2021) (citation omitted). A prosecutor has "reasonable latitude" to present the Commonwealth's case to the jury "and may employ oratorical flair" in arguing based on the evidence admitted at trial and proper inferences from it. ***Id.*** at 429 (quoting ***Commonwealth v. Williams***, 896 A.2d 523, 542 (Pa. 2006)). This includes making "a fair response to a claim made by defendant or his counsel at trial." ***E.g.***, ***Commonwealth v. Copenhefer***, 719 A.2d 242, 251 (Pa. 1998). However, a prosecutor may not make comments that unavoidably "prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so they could not weigh the evidence objectively and render a true verdict." ***Reid***, 259 A.3d at 429. The limits of permissible argument depend on the issues and elements to be resolved at trial. ***Commonwealth v. Clancy***, 192 A.3d 44, 62 (Pa. 2018).

Tanguay contends that the ADA's argument improperly insinuated what he "should have said" at trial, although he exercised his Fifth Amendment right not to testify. Tanguay's Brief at 24. The ADA argued in relevant part, referring to a recorded phone call from Z.G.'s mother M.G. to Tanguay:

> [The ADA]: . . . There is no allegation whatsoever that [Tanguay] held [Z.G.] down by force, that he did anything against her will, that he was violent, that he was aggressive. That's not what she

said at any point during this, and that is why defense's whole argument falls apart.

What they are asking you to believe is that this is a kid who was under so much pressure from her mother, so much fear of disappointment, that she would do anything to kind of shift the focus away from herself and have mom focus on something else so she could get back in mom's good graces.

It doesn't make sense that if that is your goal, you're going to tell a story that implicates yourself. . . .

Where their story also falls apart is the fact that mom wasn't the first one she told. . . .

Their defense also falls apart because [Z.G.] acted exactly how a fourteen year old acts when they're being exposed to new sexual experiences that they aren't sure is okay or not. . . .

**It also**—**their defense doesn't explain the calls that we heard**—

[Defense counsel]: Objection for burden shifting. I've given some—

THE COURT: Overruled.

[The ADA]: **It also doesn't explain how [Tanguay] responded as the investigation unfolded**. We saw those text messages, and I think all of us that were hearing those could describe those as flirtatious.

It also doesn't explain why he was talking to a fourteen year old about liking vagina. It doesn't explain why he was joking around her about her friends having a crush on him and not wanting the baby to grow up. And it also doesn't explain how he responded on the recorded phone call.

He denies sexual activity occurred, and thankfully just because an accused denies something isn't reason to throw the case out, though as Detective Coffey here wouldn't have much to do most days, but what we do hear him admit to is that the cuddling wasn't appropriate. He said that crossed the line. He was aware of that.

He admitted to kissing her on the forehead. He admitted to the stuff he was already caught doing. He knew that [M.G.] had

- 11 -

already seen the cuddling. He's a smart guy. He's college educated. We can tell by hearing him speak that he's intelligent. He knows that he can't admit to stuff; otherwise, there's going to be consequences for him.

How many times did you hear him say, if I say this happened, I'm going to work at McDonald's for the rest of my life. If I say this happened, I'm going to go to jail. He kept saying that over and over again, so we know that when [s]he's having this conversation with him, what he's thinking about is I don't want to get myself in trouble, but **if his only reason for acting that way on that call was because he was innocent, why didn't he say**—

[Defense counsel]: Objection.

THE COURT: Overruled.

[The ADA]: **Why did he not react when she's throwing these volatile accusations**. Why did he agree to attend counseling and talk about everything as a hypothetical. And you heard in that call when he said sexual assault only becomes sexual assault because she regrets it.

That's when she's saying that it went too far because she was comfortable with it up to a point and now that she's not comfortable with it and she regrets it, now it's sexual assault.

Ladies and gentlemen, their defense doesn't explain that, and what you have to keep in mind throughout this process is that there is—there are different—just like defense said—different motivations for each person in this courtroom.

And we as the Commonwealth undoubtedly bear the burden in this case without a shadow of a doubt. It is my job to prove to you that these acts happened beyond a reasonable doubt. We can do that[,] as the judge is going to instruct you[,] with just the victim's testimony.

N.T., 3/25/21, at 65–67 (emphasis added).

The trial court explained that it did not believe the ADA's statement in closing argument to be improper or prejudicial. Trial Court Opinion, 2/18/22, at 11. According to the trial court, the ADA's argument was a "badly worded

way" of responding to the defense theory that Z.G. fabricated her statements, within the realm of permissible advocacy. *Id.* at 12. Further, the trial court instructed the jury on the presumption of innocence, the Commonwealth's burden of proof, and the defendant's constitutional right not to testify. *Id.*; *see* N.T., 3/25/21, at 71, 76.

We agree with the trial court and find no abuse of discretion. In context, the ADA's statements refer to Tanguay's statements on the recorded phone call, not his silence at trial.[10] Tanguay argued in his closing about the significance of what he said and did not say on the phone call. N.T., 3/25/21, at 46. The ADA could also argue to the jury based on this evidence at trial and in fair response to Tanguay's argument. Considering the entire closing argument, and in light of the trial court's instructions, we cannot say that the ADA's statements prevented the jury from reaching a true verdict. Therefore, the trial court did not abuse its discretion in overruling Tanguay's objections.

---

[10] Tanguay's Rule 1925(b) statement and statement of the questions involved on appeal limit our analysis to "burden-shifting language." To the extent that the ADA's argument about the phone call also referenced Tanguay's pre-arrest silence, Tanguay waived any constitutional argument by citing only the Fifth Amendment, not Article I, Section 9 of the Pennsylvania Constitution. **Cf. Commonwealth v. Reid**, 259 A.3d 395, 426–27 (Pa. 2021) (distinguishing **Commonwealth v. Molina**, 104 A.3d 430 (Pa. 2014) (plurality)) (denying relief based on a prosecutor's closing argument about pre-arrest silence where the defendant cited only the federal, not Pennsylvania, Constitution).

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/22/2022